OPINION
 

 ORLOFSKY, District Judge:
 

 Defendant, Michael Norwood, has moved for permission to introduce expert testimony at trial relating to the reliability of eyewitness identification, since he contends that the Government will rely, in part, upon the testimony of eyewitnesses in proving its case.
 

 In deciding this question, I must perform the “gatekeeping role” assigned to district judges by the Supreme Court in
 
 Daubert v. Merrell Dow Pharmaceuticals, Inc.,
 
 509 U.S. 579, 597, 113 S.Ct. 2786, 2798-99, 125 L.Ed.2d 469 (1993), and apply both the techniques of
 
 Daubert,
 
 and Judge Becker’s prescient opinion in
 
 United States v. Downing,
 
 753 F.2d 1224 (3d Cir.1985), to the unique facts of this case.
 

 For the reasons which follow, Defendant’s motion to introduce expert testimony relating to the reliability of eyewitness identification will be granted.
 

 
 *1134
 
 I. Factual and Procedural Background
 

 On April 18, 1996, Defendant, Michael Norwood, was arrested by the New Jersey State Police in Holmdel, New Jersey, and charged in state court with unlawful possession of a handgun, two counts of aggravated assault, conspiracy to commit carjacking, theft and attempted motor vehicle theft arising out of a bank robbery that occurred on April 12, 1996, at Amboy National Bank in Old Bridge, New Jersey, and a carjacking of a 1987 Chrysler LeBaron on the Garden State Parkway later that same day.
 

 On April 24, 1996, the Grand Jury in and for the District of New Jersey returned a one-count indictment charging the defendant with a violation of the federal carjacking statute, 18 U.S.C. §§ 2119 and 2. Shortly thereafter, on May 22, 1996, the Grand Jury in and for the District of New Jersey returned a six-count superseding indictment charging the defendant with the following: bank robbery, in violation of 18 U.S.C. § 2113(a) (Count One); assault on bank employees and customers by the use of a dangerous weapon, specifically a handgun, in violation of 18 U.S.C. § 2113(d) (Count Two); carrying a handgun during the bank robbery, in violation of 18 U.S.C. § 924(c) (Count Three); theft of a motor vehicle that had traveled in interstate commerce, in violation of 18 U.S.C. § 2119 (Count Four); carrying a handgun during the carjacking, in violation of 18 U.S.C. § 924(c) (Count Five); and possession of a handgun by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e) (Count Six). The Defendant was arraigned on the first superseding indictment on May 31,1996, and entered pleas of “riot guilty” on all charges. A second superseding indictment was returned on July 19, 1996, amending certain dates set forth in the first superseding indictment. The trial of this case is scheduled to commence on Monday, September 9,1996, at 9:30 a.m.
 

 II. Discussion
 

 Rule 702 of the Federal Rules of Evidence “authorizes the admission of expert testimony so long as it is rendered by a qualified expert and is helpful to the trier of fact.”
 
 United States v. Stevens,
 
 935 F.2d 1380, 1397 (3d Cir.1991) (citation omitted).
 
 [1]
 
 In
 
 United States v. Downing,
 
 753 F.2d 1224 (3d Cir.1985), the Court of Appeals for the Third Circuit recognized that Rule 702 may permit “a defendant in a criminal prosecution to adduce, from an expert in the field of human perception and memory, testimony concerning the reliability of eyewitness identifications.”
 
 Id.
 
 at 1226.
 

 In so holding, the
 
 Downing
 
 Court held that the determination whether to admit such testimony requires an examination of the following criteria:
 

 First, the evidence must survive preliminary scrutiny in the course of an in limine proceeding conducted by the district judge. This threshold inquiry, which we derive from the helpfulness standard of Rule 702, is essentially a balancing test, centering on two factors: (1) the reliability of the scientific principles upon which the expert testimony rests, hence the potential of the testimony to aid the jury in reaching an accurate resolution of a disputed issue; and (2) the likelihood that the introduction of the testimony may in some way overwhelm or mislead the jury. Second, admission depends upon the “fit,” i.e., upon a specific proffer showing that scientific research has established that particular features of the eyewitness identifications involved may have impaired the accuracy of those identifications. The district court’s assessment of these factors will guide its discretion in deciding whether to admit the evidence under Fed.R.Evid. 702.
 

 Downing,
 
 753 F.2d at 1226. In sum, the reliability, the propensity to confuse or overwhelm, and the fit of the proposed testimony must all be considered by a district court before it can be introduced at trial.
 

 In this case, the Defendant seeks leave to introduce the testimony of Michael R. Leippe, Ph.D., concerning the reliability of
 
 *1135
 
 eyewitness identifications. An
 
 in limine
 
 hearing on this issue was conducted before this Court on September 3,1996.
 
 [2]
 

 Dr. Leippe’s qualifications, to which he testified at the
 
 in limine
 
 hearing, and which appear in his resume are impressive. (Resume, Defendant’s Exhibit 2). He has a Ph.D. in social psychology, and has taught in the field of psychology since 1976. Moreover, as also reflected in his resume, Dr. Leippe testified at the
 
 in limine
 
 hearing that he has conducted research in many fields including social influence processes, psychology and law, eyewitness memory and its communication, prejudice, and social cognition. In addition, he stated that he has edited or published dozens of articles in the field of psychology, and more specifically, the areas of eyewitness identification and memory. Finally, Dr. Leippe has testified as an expert on the reliability of eyewitness testimony in criminal cases throughout the country. Based upon the foregoing, I find that Dr. Leippe qualifies as an expert in the field of psychology as it relates to eyewitness identification.
 

 At the
 
 in limine
 
 hearing, Dr. Leippe outlined the following specific areas in which he plans to testify at trial: (1) the accuracy of cross-racial identifications relative to same-race identifications; (2) the effect of “weapon focus” on identifications; (3) the effect of stress on identifications; (4) the “forgetting curve,” ie., the effect of time on memory as it relates to identification; (5) the “relation back” phenomenon; (6) the lack of correlation between the confidence a witness expresses in making an identification and the accuracy of the identification; (7) the suggestiveness of the photo array used during the pretrial identification procedures in this case; and (8) exposure duration.
 
 [3]
 

 Notwithstanding Dr. Leippe’s expertise in the field of psychology in which he proposes to testify, the Court must nonetheless assess Dr. Leippe’s proposed testimony against the guidelines set forth in Fed.R.Civ.P. 702, as construed by the United States Supreme Court in
 
 Daubert,
 
 and by the Third Circuit in
 
 Downing.
 
 The specific areas of Dr. Leippe’s proposed testimony must be examined to ascertain its reliability, likelihood to overwhelm or mislead the jury, and “fit” to the particular facts of this case. In addition, Dr. Leippe’s testimony must also be considered to determine whether it meets the “helpfulness” standard of Rule 702. “Helpfulness,” as Judge Becker noted in
 
 Downing,
 
 is the “touchstone of Rule 702,”
 
 ie.,
 
 whether the testimony ‘“will assist the trier of fact to understand the evidence or to determine a fact in issue.’ ”
 
 Downing,
 
 753 F.2d at 1235 (citing Fed.R.Evid. 702).
 

 A. The Reliability and Tendency to Confuse or Overwhelm the Jury
 

 As noted above, Defendant proposes to introduce the testimony of Dr. Leippe relating to the reliability of eyewitness identification. The inquiry “as to whether a particular scientific technique or method is reliable is a flexible one.”
 
 In re Paoli R.R. Yard PCB Litigation,
 
 35 F.3d 717, 742 (3d Cir.1994).
 

 In
 
 Daubert v. Merrell Dow Pharmaceuticals, Inc.,
 
 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the United States Supreme Court suggested numerous factors to be considered by a district court in assessing the reliability of scientific testimony. Such factors include: (1) whether the expert’s hypothesis can be, and has been tested; (2) whether the methodology has been subjected to peer review and publication; (3) the frequency by which the methodology leads to erroneous results; (4) the existence and maintenance of standards controlling the
 
 *1136
 
 technique’s operation; and (5) whether the methodology has been generally accepted in the scientific community.
 
 Id.
 
 at 592-93, 113 S.Ct. at 2796-97.
 

 Virtually all of these factors were listed by the Third Circuit in
 
 Downing
 
 as considerations which should be addressed by a district court in assessing the reliability of scientific expert testimony. The Court in
 
 Downing,
 
 however, included two additional factors which were not discussed in
 
 Daubert
 
 — the qualifications of the expert witness testifying and the non-judicial uses to which the scientific • technique are put.
 
 Downing,
 
 753 F.2d at 1238-39. Indeed, the Third Circuit has specifically stated that “a district court should take into account all of the factors listed by either
 
 Daubert
 
 or
 
 Downing”
 
 when assessing the reliability of proposed scientific expert testimony.
 
 In re Paoli R.R.,
 
 35 F.3d at 742.
 

 At the
 
 in limine
 
 hearing, Dr. Leippe described in detail the many studies, which either he or other reputable experts in the field conducted, on which he relied in formulating his conclusions relating to each of the areas to which he plans to testify at trial. Dr. Leippe explained that, based upon his scientific training and background, he was able to determine that each study scrupulously adhered to scientifically valid methodologies, was capable of replication and objective measurement, and was subjected to discriminating peer review prior to publication. Dr. Leippe added that the studies involved,
 
 inter alia,
 
 the live simulation of a crime scene under controlled conditions, video or slide projections of images and faces, and the post-crime study of the accuracy of eyewitness identification of victims of actual crimes.
 

 At the
 
 in limine
 
 hearing, Dr. Leippe presented the Court with specific studies, along with the testing conditions and underlying data relied upon in the studies he described. Upon consideration of Dr. Leippe’s testimony, I conclude that the jury, when presented with Dr. Leippe’s conclusions, properly supported by a detailed description of each study upon which he relies, as well as the data supporting each study, will be able to understand his testimony and will not be confused, misled or overwhelmed. Although Dr. Leippe briefly testified regarding the data on which each study relied at the
 
 in limine
 
 hearing, in order for his testimony to be admissible and truly reliable, at trial he must discuss such underlying data in greater detail and depth.
 
 See Downing,
 
 753 F.2d at 1239 (“[t]he danger that scientific evidence will mislead the jury might be greater, for example, where the jury is not presented with the data on which the expert relies, but must instead accept the expert’s assertions as to the accuracy of his conclusions”).
 

 Accordingly, based on the standards set forth in
 
 Daubert
 
 and
 
 Downing
 
 for assessing the reliability of proposed scientific expert testimony,
 
 [4]
 
 I find Dr. Leippe’s proposed testimony to be sufficiently reliable so that, barring any other evidentiary infirmities with his testimony which may develop at trial, such as its tendency to overwhelm, lack of fit, or lack of helpfulness, he may testify at trial in accordance with the Federal Rules of Evidence, as construed by
 
 Daubert
 
 and
 
 Downing.
 
 I now turn to an analysis of each subject area of testimony to be presented by Dr. Leippe.
 

 B. “Fit” and “Helpfulness” of Dr. Leippe’s Testimony
 

 With regard to the “fit” of the proposed testimony, the Third Circuit has held that “a defendant who seeks the admission of expert testimony must make an on-the-record detailed proffer to the court, including an explanation of precisely how the expert’s testimony is relevant to the eyewitness identifications under consideration ... Failure to make such a detailed proffer is sufficient grounds to exclude the expert’s testimony.”
 
 Downing,
 
 753 F.2d at 1242.
 

 
 *1137
 
 Accordingly, the specific subject areas of Dr. Leippe’s proposed testimony must be examined to ascertain whether each is sufficiently tied to the facts of this particular case. Additionally, even if an area of proposed testimony is sufficiently tied to the facts of this case, it must also be examined to determine whether such testimony will prove “helpful” to the jury within the meaning of Fed.R.Evid. 702.
 

 (1)
 
 Cross-Racial Identification
 

 Defendant first seeks to have Dr. Leippe testify regarding the accuracy of cross-racial identifications relative to same-race identifications. In this case, all of the eyewitnesses are white, while the Defendant is black. Accordingly, Dr. Leippe’s testimony on the issue of the reliability of cross-racial identification is “sufficiently tied to the facts of [this] case.”
 
 Downing,
 
 753 F.2d at 1242.
 

 At the
 
 in limine
 
 hearing, Dr. Leippe testified that expert testimony relating to the reliability of cross-racial identification would be helpful to a jury since, based upon studies, such information is not necessarily within the common knowledge of the average juror.
 

 Courts have found expert testimony of this nature, describing the reduced accuracy of cross-racial identifications as compared to same-race identifications, to be helpful to a jury. In
 
 United States v. Smith,
 
 736 F.2d 1103, 1106 (6th Cir.1984), for example the Court found such testimony to be helpful since it “would not only ‘surpass’ commonsense evaluation, it would question commonsense evaluation.”
 
 Id.
 
 at 1106.
 

 Testimony relating to the diminished accuracy of cross-racial identifications relative to same-race identifications was also admitted by the trial court in
 
 Stevens,
 
 935 F.2d at 1397.
 
 See also Dawning,
 
 753 F.2d at 1231, 1242 (finding that “studies demonstrating] the inherent unreliability of cross-racial identifications ... not only might have assisted the jury, but might have refuted their otherwise common assumptions about the reliability of eyewitness identification”) (citing
 
 United States v. Stevens,
 
 736 F.2d 1103, 1106 (6th Cir.1984)).
 

 Thus, I find that such testimony will prove helpful to the jury in this case.
 

 (2)
 
 Weapon Focus
 

 Defendant seeks to have Dr. Leippe testify regarding the effect of “weapon focus” on identifications. At the
 
 in limine
 
 hearing, Dr. Leippe stated that numerous studies indicate that eyewitness identifications are less accurate when a weapon was present at the crime scene, than when a weapon was not present. Dr. Leippe explained that in situations where a weapon is present, a witness will have a tendency to focus upon the weapon, rather than on the face of the perpetrator.
 

 In this case, it is alleged that one of the perpetrators of the carjacking offense wielded a handgun at the time of the offense. Accordingly, I find that Dr. Leippe’s testimony on the issue of “weapon focus” is “sufficiently tied to the facts of [this] case.”
 
 Downing,
 
 753 F.2d at 1242.
 

 Moreover, Dr. Leippe further explained that, while scientific studies have consistently found that witness identifications are notably less accurate when a weapon was present, studies also reveal that many lay people erroneously believe the opposite to be true. Accordingly, I find that Dr. Leippe’s testimony relating to the “weapon focus” phenomenon will be helpful to the jury.
 
 See Stevens,
 
 935 F.2d at 1397 (expert testimony relating to “weapon focus” admitted by the trial court).
 

 (3)
 
 Stress
 

 Dr. Leippe also testified at the
 
 in limine
 
 hearing as to the effect of stress on eyewitness identifications. Dr. Leippe explained that numerous studies reveal that, while low levels of stress may increase an individual’s memory, extreme levels of stress will often impair memory. In this case, it is alleged that two of the eyewitnesses, who were also the victims of the carjacking offense, were under a great deal of stress since a handgun was allegedly brandished by the perpetrator and threats were allegedly made to the victim-eyewitnesses. Therefore, I find that Dr. Leippe’s testimony on the effect of stress on the reliability of eyewitness identifi
 
 *1138
 
 cation is “sufficiently tied to the facts of [this] case.”
 
 Downing,
 
 753 F.2d at 1242.
 

 Dr. Leippe also testified that expert testimony in this area would prove helpful to the jury because, while many scientific studies show that an intense level of stress impairs memory, many lay people assume just the opposite — that memory becomes more acute the higher the stress. In addition, many courts have repeatedly found expert testimony on this issue to be helpful to a jury. In
 
 United States v. Sebetich,
 
 776 F.2d 412, 419 (3d Cir.1985), the Third Circuit held that it was error for the district court to exclude expert testimony relating to the reliability of eyewitness testimony when the eyewitness was under stressful circumstances. In so holding, the Court stated that “[tjhere is evidence that stress decreases the reliability of eyewitness identifications, contrary to common understanding.”
 
 Id.
 
 at 419.
 
 See also Downing,
 
 753 F.2d at 1232 (“most people, and hence most jury members, probably believe that stress increases the accuracy of one’s perception”);
 
 Stevens,
 
 935 F.2d at 1397 (district court admitted expert testimony relating to the effect of stress on the reliability of eyewitness identification). Thus, I find that such testimony regarding the relationship between stress and the accuracy of eyewitness identification will prove helpful to the jury in this case.
 

 (4)
 
 Forgetting Curve
 

 Dr. Leippe also presented testimony at the
 
 in limine
 
 hearing relating to a phenomenon known as the “forgetting curve,”
 
 i.e.,
 
 the effect of time on memory as it relates to identification. He asserted that studies show that, according to the “forgetting curve” phenomenon, memory weakens at a non-constant rate with the passage of time, with most of the forgetting taking place within the first hours following the event, and certainly within the first few days following the event.
 

 In this case, there was some passage of time between the incident alleged and the eyewitness identifications — one of the victim’s identification of the Defendant was made the day after the alleged carjacking, the other victim’s identification was made three days after the alleged carjacking, and the Boston Market employee’s identification was made eight days after the witness allegedly observed the Defendant in the restaurant. Accordingly, I find that Dr. Leippe’s testimony as it relates to the “forgetting curve” is “sufficiently tied to the facts of [this] case.”
 
 Downing,
 
 753 F.2d at 1242.
 

 Dr. Leippe also stated that, while lay persons may understand that memory decreases with the passage of time, most individuals do not realize that memory decreases at a non-constant rate, with much of the memory loss occurring very shortly after the event. In
 
 United States v. Sebetich,
 
 776 F.2d 412, 419 (3d Cir.1985), for example, the Third Circuit held that it was error for the district court to exclude expert testimony relating to the effect of the passage of time on the reliability of eyewitness identification, finding that such testimony is a proper subject for expert testimony.
 
 See also Downing,
 
 753 F.2d at 1230-31 (finding that testimony relating to the “forgetting curve,”
 
 i.e.,
 
 the fact that memory does not diminish at a uniform rate, may be helpful to the jury in assessing the reliability of eyewitness testimony). Likewise, I find that testimony relating to the “forgetting curve” will prove helpful to the jury in this case.
 

 (5)
 
 Relation Back
 

 At the
 
 in limine
 
 hearing, Dr. Leippe also testified to the “relation back” phenomenon — which states that an initial identification made by an eyewitness may influence that eyewitness’s later identifications and perceived memories of the event. Dr. Leippe explained that several studies have shown that once an identification is made from a photo spread, an eyewitness may make an erroneous in-court identification based upon the face initially identified in the photo spread, rather than based upon the face actually seen during the alleged crime.
 

 In this ease, the Defendant contends that due to the “relation back” phenomenon, the eyewitnesses may subconsciously incorrectly identify the Defendant in court simply because they identified him earlier in a photo array, and not because they actually remember his face from the alleged incident.
 
 *1139
 
 Therefore, since all of the eyewitnesses in this case identified the Defendant in a pretrial photo spread, Dr. Leippe’s testimony on the issue of the “relation back” phenomenon is “sufficiently tied to the facts of [this] case.”
 
 Downing,
 
 758 F.2d at 1242.
 

 Dr. Leippe further explained that, while jurors may understand the general nature of the “relation back” phenomenon, the average lay person does not comprehend the magnitude of its impact on eyewitness memory.
 

 In
 
 Stevens,
 
 because the eyewitness first identified the defendant from a “wanted board,” and then picked the Defendant out from a photo array, the defendant sought to offer expert testimony on the “relation-back” phenomenon. In
 
 Stevens,
 
 however, the Third Circuit held that it was not an abuse of discretion for the district court to exclude expert testimony describing the “relation-back” phenomenon, finding that in that case, such testimony could be “susceptible of elucidation without specialized scientific knowledge and thus could [be] fleshed out adequately by counsel through probing cross-examination and argument pitched to the common sense of the jury.”
 
 Stevens,
 
 935 F.2d at 1399-1400.
 

 Notwithstanding the
 
 Stevens
 
 Court’s finding that it was not an abuse of discretion for the district court to exclude such testimony, I find that expert testimony relating to the “relation-back” phenomenon would prove helpful to the jury in this case in assessing the reliability of the eyewitnesses’ in-court identifications of the Defendant which were made after earlier pretrial identifications of the Defendant in a photo spread. Although the jury may understand the nature of such a phenomenon, I find that the impact on memory of the “relation-back” phenomenon may be beyond the common knowledge of an ordinary lay person, and therefore, such testimony would be “helpful” to the jury.
 

 (6)
 
 Confidence
 
 — Accuracy
 
 Correlation
 

 Dr. Leippe also testified at the
 
 in limine
 
 hearing regarding the lack of correlation between the confidence of a witness and the accuracy of the witness’s identification. Dr. Leippe stated that numerous studies show that the amount of confidence expressed by an eyewitness in his or her memory has little or no relationship to the accuracy of that witness’s identification. Hence, it is clear that Dr. Leippe’s testimony on the relationship between confidence and accuracy of eyewitness identification is “sufficiently tied to the facts of [this] case.”
 
 Downing,
 
 753 F.2d at 1242.
 

 Dr. Leippe also testified that contrary to the results of most scientific studies in this area, most lay persons think that there is a strong correlation between the confidence expressed by a witness in his or her eyewitness identification, and the accuracy of that identification. The Third Circuit has held that expert testimony relating to the lack of correlation between the confidence of a witness and the accuracy of the witness’s identification is helpful to a jury since “[t]o the extent that a mistaken witness may retain great confidence in an inaccurate identification, cross-examination can hardly be seen as an effective way to reveal the weaknesses in a witness’ recollection of an event.”
 
 Downing,
 
 753 F.2d at 1230-31 n. 6.
 

 Indeed, in
 
 Stevens,
 
 the Third Circuit held that the district court abused its discretion in barring expert testimony on the confidence/aeeuracy correlation.
 
 Stevens,
 
 935 F.2d at 1400-01. In so holding, the Court noted that the fact that “witnesses ofttimes profess considerable confidence in erroneous identifications is fairly counterintuitive,” and thus found that, “in contradistinction to the proffered testimony about the suggestiveness of the wanted board and the “relation-back” issue, [the expert’s] explication of the confidence/aceuracy studies could prove helpful to the jury in assessing the reliability of [the eyewitnesses’] identifications.”
 
 Id.
 
 at 1400. Accordingly, I find that testimony relating to the correlation between confidence and accuracy of eyewitness identifications will prove helpful to the jury in this case.
 

 (7)
 
 Suggestiveness of Pre-Trial Identification Procedures
 

 At the
 
 in limine
 
 hearing, Dr. Leippe also testified as to the impact of the suggestiveness of pretrial identification procedures on the reliability of eyewitness identification.
 
 *1140
 
 In this ease, the Defendant alleges that the photo array utilized by the police was inherently suggestive, as were the instructions given to one of the eyewitnesses during the pretrial identification procedure. Therefore, Dr. Leippe’s testimony on the issue of the suggestiveness of pretrial identification procedures is “sufficiently tied to the facts of [this] case.”
 
 Downing,
 
 753 F.2d at 1242.
 

 In
 
 Stevens,
 
 the defendant sought to introduce expert testimony relating to the suggestive qualities of the “wanted board” used by the police during the pretrial identification procedures. The Third Circuit, however, held that it was not an abuse of discretion for the district court to refuse to admit expert testimony regarding the suggestiveness of a “wanted board.” In so holding, the Court stated that the suggestive attributes of the “wanted board” alleged by the defendant— that there were two pictures of the defendant and that the defendant’s picture was the only color photograph — were “sufficiently apparent [to] the jury ... for the jury to make its own determination.”
 
 Id.
 
 at 1399.
 

 In this case, however, I find that the alleged suggestive attributes of the pretrial identification procedures are not as self-evident to a jury as those alleged in
 
 Stevens.
 
 Specifically, in this case, the Defendant contends that:
 

 The photograph of the defendant is significantly darker than the other photographs ... The very appearance of the photograph, therefore, attracts the attention of anyone who views the array. The appearance of the defendant is further highlighted by a comparison of the defendant’s physical appearance in an array when compared to the appearance of the people depicted in the other photographs. That is the defendant appears to be much thinner than any of the other individuals. This difference is particularly important because the description provided to the police by witnesses to the crime described a thin black male.
 

 (Letter Brief, dated August 7, 1996, from Lori M. Koch, Esq., to Judge Stephen M. Orlofsky).
 

 Moreover, at the
 
 in limine
 
 hearing, the Defendant also alleged that Detective Flarity, the New Jersey State Police Detective who conducted the pretrial photographic identification procedure with Mr. Angelo Ferraro, one of the alleged victims of the carjacking, read the required preliminary statement
 
 [5]
 
 twice to Mr. Ferraro, once immediately upon showing him the photo array, and again, after Mr. Ferraro indicated that “[i]t’s either #5 or #6. #5 looks like the guy, but I didn’t think he was quite so dark skinned.” (Defendant’s Exhibit 4). Defendant contends that because the preliminary statement read to the eyewitness contains the phrase “photographs do not always depict the true complexion of a person — it may be lighter or darker than shown in a photograph,” Detective Flarity was suggesting to Mr. Ferraro that the individual depicted in photograph number five was the perpetrator, notwithstanding how dark or light he appeared in the photograph.
 

 In addition, since the “wanted board” in
 
 Stevens
 
 was not prepared for the specific purpose of pretrial eyewitness identification, it may be obvious to a lay person that the features of such a general “wanted board” may be more suggestive than those of a photo array prepared by the police for the purpose of pretrial identification relating to a specific case.
 

 Because I find the allegedly suggestive aspects of the photo array utilized in this case to be far more subtle than those alleged in
 
 Stevens,
 
 I conclude that expert testimony relating to the impact of these allegedly suggestive features on the reliability of eyewit
 
 *1141
 
 ness identification resulting from the photo array used in this ease would be helpful to the jury.
 

 (8)
 
 Exposure Duration
 

 At the
 
 in limine
 
 hearing, Dr. Leippe also testified to the effect of exposure duration on the reliability of eyewitness identification. Dr. Leippe stated that studies have shown that there is not necessarily a linear relationship between exposure duration and memory retention, as the amount of time a witness viewed the perpetrator during the alleged crime may have little to do with that witness’s retention. Dr. Leippe’s testimony on the relationship between exposure duration and the reliability of eyewitness identification is “sufficiently tied to the facts of [this] case,”
 
 Downing,
 
 753 F.2d at 1242, since the alleged eyewitnesses contend that they viewed the perpetrator for a matter of minutes, or even seconds dining the alleged incident.
 

 Moreover, Dr. Leippe stated that the findings of studies in this area are somewhat contrary to common understanding, since most lay people believe that the longer the exposure to a subject, the greater the retention in memory, and vice versa. He testified that it is not generally understood that the effect of exposure duration may be virtually nullified by other external factors such as stress, and weapon focus, which may impair a witness’s ability to remember. Therefore, I find that Dr. Leippe’s testimony relating to the effect of exposure duration on an eyewitness’s memory will be helpful to the jury.
 

 For the foregoing reasons, Defendant’s motion for leave to introduce expert testimony on the reliability of eyewitness identification will be granted. Specifically, Defendant will be permitted to introduce the expert testimony of Dr. Leippe in the following areas of eyewitness identification: (1) the accuracy of cross-racial identifications relative to same-race identification; (2) the effect of weapon focus on identifications; (3) the effect of stress on identifications; (4) the “forgetting curve,”
 
 i.e.,
 
 the effect of time on memory as it relates to identification; (5) the “relation back” phenomenon; (6) the lack of correlation between the confidence of a witness and the accuracy of the identification; (7) the suggestiveness of the photo array used during the pretrial identification procedures in this ease; and (8) exposure duration.
 

 The Court will enter an appropriate order.
 

 ORDER
 

 This matter having come before the Court on the motion of Defendant for leave to introduce the expert testimony at trial relating to the reliability of eyewitness identification, Lori M. Koch, Esq., Assistant Federal Public Defender, appearing on behalf of the Defendant, and Carlos F. Ortiz, Esq., Assistant United States District Attorney, appearing on behalf of the United States; and,
 

 The Court having considered the briefs of the parties filed in support of, and in opposition to Defendant’s motion, as well as the testimony of witnesses and the oral argument of counsel at an
 
 in limine
 
 hearing conducted in this case on September 3, 1996;
 

 For the reasons set forth in this Court’s Opinion filed with this Order;
 

 IT IS HEREBY ORDERED on this 6th day of September, 1996, that Defendant’s motion for leave to introduce the expert testimony at trial relating to the reliability of eyewitness identification is granted; and,
 

 IT IS FURTHER ORDERED that Defendant may introduce at trial the expert testimony of Michael Leippe, Ph.D., in the following areas: (1) the accuracy of cross-racial identifications relative to same-race identification; (2) the effect of “weapon focus” on identifications; (3) the effect of stress on identifications; (4) the “forgetting curve,”
 
 i.e.,
 
 the effect of time on memory as it relates to identification; (5) the “relation back” phenomenon; (6) the lack of correlation between the confidence a witness expresses in making an identification and the accuracy of the identification; (7) the suggestiveness of the photo array used during the pretrial identification procedures in this case; and (8) exposure duration.
 

 [1]
 

 . Rule 702 provides that ”[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.”
 

 [2]
 

 . As noted by the Court of Appeals for the Third Circuit in
 
 United States v. Downing,
 
 753 F.2d 1224, 1241 (3d Cir.1985):
 

 It would appear that the most efficient procedure that the district court can use in making the reliability determination is an in limine hearing. Such a hearing need not unduly burden the trial courts; in many cases, it will be only a brief foundational hearing either before trial or at trial but out of the hearing of the jury.
 

 [3]
 

 . Except for the area of "exposure duration,” all of these areas of proposed testimony were also set forth in the Affidavit of Dr. Leippe, submitted to this Court prior to the
 
 in limine
 
 hearing on this issue. (Leippe Aff. at 2-3, Defendant’s Exhibit 1).
 

 [4]
 

 . Such factors include: whether the expert's hypothesis can be, and has been tested, whether the methodology has been subjected to peer review and publication, the frequency by which the methodology leads to erroneous results, the existence and maintenance of standards controlling the technique’s operation, and whether the methodology has been generally accepted in the scientific community.
 
 See Daubert,
 
 509 U.S. at 592-93, 113 S.Ct. at 2796-97;
 
 Downing,
 
 753 F.2d at 1238-39.
 

 [5]
 

 . The prepared preliminary statement reads:
 

 I am about to show you a group of photographs which may or may not contain a picture of the person who committed the crime now being investigated. In viewing these photographs keep in mind that hair styles, beards, and moustaches may be easily changed. Also, photographs do not always depict the true complexion of a person — it may be lighter or darker than shown in a photograph. Pay no attention to any other differences in the photographs. Concentrate only on the person depicted within the photograph. When you have looked at all the photographs, tell me if you recognize anyone pictured here. Do not tell other witnesses that you have or have not identified anyone. (Government’s Exhibit 1) (emphasis in original).