FIRST DIVISION
September 28, 2007

No. 1-06-1943

THE PEOPLE OF THE STATE OF ILLINOIS,    )    Appeal from the
                                        )    Circuit Court of
        Plaintiff-Appellee,             )    Cook County.
                                        )
            v.                          )
                                        )
WALTER ALLEN,                           )    Honorable
                                        )    Daniel P. Darcy,
        Defendant-Appellant.            )    Judge Presiding.


JUSTICE WOLFSON delivered the opinion of the court:

Social scientists have been conducting research into the ability of one human being to identify another. Whether such an expert should be allowed to testify in a criminal case is a matter of broad discretion for the trial court. In light of the specific circumstances of this case, we hold reversible error was committed when the trial court refused to allow an expert to testify. We reverse the defendant's conviction and remand for a new trial.

This was a jury trial. The defendant, Walter Allen, was convicted of attempt murder, attempt armed robbery, and aggravated battery with a firearm. He was sentenced to a total of 43 years in prison.

In addition to the rejection of his expert witness, defendant raises fourth amendment and due process issues that

must be resolved before we reach the matter of the expert witness.

FACTS

On March 22, 2001, two black males entered Four Star Dry Cleaners, showed a gun, and demanded money. During the robbery, one of the men "pistol whipped" Che Shin, an employee at the cleaners. No money was taken. Defendant was identified as a suspect in the attempt robbery after two witnesses, Phil Jones and Calvin Smith, told police they saw defendant run past them near the cleaners shortly after the robbery occurred. Sometime before April 10, 2001, Shin identified defendant from a photo array as one of the people who robbed him. That is not the case before us, but it plays a role in the case we do decide.

On April 17, 2001, a second attempt armed robbery was committed at the same cleaners. Miye Goodson, an employee at the cleaners, was standing at the counter when two men entered the store. One of the men wore a dark hooded sweatshirt. The other man wore a yellow hooded sweatshirt with the hood up, and he stood and looked out the window. After one of the men approached the counter, Goodson asked if she could help him. The man did not respond. When Goodson asked again, the man reached into his pocket, pulled out a silver handgun, and said: "This is a stick-up. Give money." When Goodson turned around to get money from the cash register, she was shot in the back.

Before trial, defendant filed several pre-trial motions, including a motion to suppress Goodson's identification, a motion to quash defendant's arrest, and a motion to exclude gunshot residue evidence. The State filed a motion in limine to exclude the testimony of Dr. Steven Penrod, an expert in eyewitness identification.

During the December 21, 2004, hearing on defendant's motion to suppress identification, Goodson testified the police visited her in the hospital two days after she was shot and asked her if she was willing to look at photographs. She identified the defendant. Goodson could not recall how many photos the police showed her. Goodson said her husband had told her the police had caught the man who shot her before she identified defendant and signed his photo. Goodson admitted that when Mort Smith, an investigator hired by the defense, asked her how many pictures the police officers showed her, she responded "just the one." At trial she explained what she meant by that. She did not change her testimony. Goodson was not asked to make an in-person identification of the defendant until the preliminary hearing on December 21, 2004, when he was sitting at counsel table in a jail uniform.

Detective John O'Shea testified that on the morning of April 17, 2001, he was scheduled to go to defendant's probation officer's office to arrest defendant for the March 22 attempt

robbery. During roll call on that same morning, he learned a woman was shot during a robbery that morning at the cleaners. When defendant arrived at his probation officer's office, Detective O'Shea arrested him for the March 22 attempt robbery. Detective O'Shea did not have an arrest warrant. Shortly after defendant's arrest, Detective O'Shea transported him to the police station and requested an atomic absorption gunshot residue (GSR) test be performed on defendant's hands.

On April 19, 2001, Detective O'Shea went to Mount Sinai Hospital to interview Goodson regarding the second attempt robbery. He generated a black and white photo array on the ICAM system that included a photo of defendant. Detective O'Shea ended up using five photos that he thought were the most similar looking. When Detective O'Shea asked Goodson how she was feeling, she said she was "in pain" and "not feeling the best." Goodson agreed to look at some pictures. After viewing the photo array, Goodson identified defendant as the shooter. Goodson described the shooter to Detective O'Shea as a "male black in his 30s" and "bald, no hair." Detective O'Shea admitted telling Goodson the police had some suspects before showing her the photo array. He did not tell her the suspect was in custody. Detective O'Shea testified substantially the same at the hearing on defendant's motion to quash arrest and suppress evidence.

Following arguments, the trial court denied each of

defendant's motions.  The court granted the State's motion in limine to exclude the testimony of Dr. Penrod.

At defendant's jury trial, Goodson testified that on April 19, 2001, two detectives visited her at Mount Sinai Hospital. After Goodson said she could identify the shooter, a detective showed her five pictures.  She identified defendant as the person who shot her and signed the bottom of his photograph.  Goodson also identified defendant in open court.

Goodson admitted that when Mort Smith, a private investigator for the defense, asked her how many photos the police had shown her at the hospital, she answered "just the one."  Goodson explained she said "just the one" because she was only shown one picture of the man who shot her and four other pictures.  During cross-examination, Goodson said she could not tell in what hand defendant was holding the gun because she panicked when she saw it.

Detective O'Shea testified substantially the same as he had at the suppression hearing.

Officer Rivera, a forensic services unit investigator with the Chicago Police Department, testified that defendant did not want to participate in the GSR test.  Several detectives physically restrained defendant and positioned his hands so the test could be administered.  The detectives were not wearing

gloves, and Officer Rivera admitted he and his partner had handled their guns on the day the test was administered.

Officer Robert Berk of the Illinois State Police Forensic Science Center testified that the GSR test showed elevated levels of barium, antimony, and lead on defendant's left palm. The elements are consistent with having handled, fired, or been in close proximity to a discharged firearm. He conceded, however, that these particles can be transferred from one surface to another. He noted there is only a six hour window of time for the administration of an atomic absorption GSR test after a gun has been fired. He admitted a positive test result does not necessarily prove an individual discharged a firearm. He believed, however, that the sources of lead, barium, and antimony he detected on defendant's hand were from gunshot residue. A "scanning electron microscopy" (SEM) test did not confirm the presence of gunshot residue on defendant's clothing. Officer Berk admitted the SEM test is a more sensitive, selective, and specific test than the atomic absorption test he used.

Dr. Samuel Palenik, a forensic analytical microscopist, testified for the defense. He said the atomic absorption GSR test is an unreliable means of identifying whether GSR is present on a surface. He noted the elements detected by an atomic absorption test are found in the environment and many household items. According to Dr. Palenik, most law enforcement agencies,

including the Chicago Police Department, have moved away from the test in light of the significant problems associated with it.

Mort Smith, a private investigator, testified that he visited Goodson at her home on May 8, 2004. Goodson told him the police showed her two or three photographs when they visited the hospital in 2001. On September 22, 2004, Smith visited Goodson at her home and taped the interview. Goodson told Smith the police showed her only one photograph when she was at the hospital.

The jury found defendant guilty of first-degree attempt murder, attempt armed robbery, and aggravated battery with a firearm. Following a sentencing hearing, the trial court sentenced defendant to a 29-year sentence for the Class X felony of attempt first-degree murder. Defendant was also sentenced to a consecutive 14-year sentence for attempt armed robbery. Defendant appeals.

DECISION

I. Motion to Suppress Evidence

Defendant contends the trial court erred when it denied his motion to suppress evidence obtained in violation of his constitutional rights. Specifically, defendant contends the atomic absorption GSR test administered by the police was non-routine and completely unrelated to the March 22 attempt robbery crime he was lawfully arrested for, thus violating his fourth

amendment rights.

When reviewing a trial court's ruling on a motion to suppress evidence, the court's factual findings are reviewed for manifest error while the court's ultimate ruling is reviewed de novo. People v. Steham, 203 Ill. 2d 26, 33 (2002).

Both the United States Constitution and the Illinois Constitution protect against unreasonable searches and seizures. U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6. A warrantless search and seizure is per se unreasonable unless it comes within one of a few recognized and limited exceptions. Steham, 203 Ill. 2d at 34. "One such exception, which has been found reasonable under the fourth amendment to the United States Constitution, is a search incident to a lawful arrest." Steham, 203 Ill. 2d at 34, citing United States v. Robinson, 414 U.S. 218, 224-26, 94 S. Ct. 467, 471-73, 38 L. Ed. 2d 427, 434-36 (1973).

Defendant does not contend the police lacked probable cause to arrest him for the March 22 attempt armed robbery. Instead, he contends that because he was neither under arrest for, nor a suspect in, the April 17 attempt robbery, the police had no reasonable basis or justification for performing a GSR test on him. Defendant contends the police must provide a rational justification for conducting a search unrelated to the crime for which a defendant is arrested, which they have failed to do in

-8-

this case. Since the police were authorized to detain defendant, the question becomes to what extent he could be searched. See People v. Seymour, 84 Ill. 2d 24, 33, 416 N.E.2d 1070 (1981).

While no Illinois court has specifically addressed this issue, similar issues have been addressed at length in the federal courts.

In Schmerber v. State of California, 384 U.S. 757, 86 S. Ct. 1826, 16 L. Ed. 2d 908 (1966), a case cited by defendant, the Supreme Court was asked to consider whether the police were justified in requiring petitioner to submit to a blood test after he was arrested while receiving treatment in a hospital following a car accident. The Court explained that the fourth amendment's proper function is "to constrain, not against all intrusions as such, but against intrusions which are not justified in the circumstances, or which are made in an improper manner." Schmerber, 384 U.S. at 768, 86 S. Ct. at 1834, 16 L. Ed. 2d at 918.

The court noted that the percentage of alcohol in the blood begins to diminish shortly after drinking stops. Because the officer might reasonably have believed he was confronted with an emergency in which the delay necessary to obtain a warrant threatened the destruction of the evidence, the court held the attempt to secure evidence of blood-alcohol content was lawful under the fourth amendment.

1-06-1943

In United States v. D'Amico, 408 F.2d 331 (2nd Cir. 1969), the court was asked whether a defendant's fourth amendment rights were violated when a federal agent, without a search warrant or the defendant's consent, clipped several strands of hair from the defendant's head while he was in custody. The court held the clipping of the few strands of hair unquestionably constituted a seizure that might conceivably be subject to the constraints of the fourth amendment. D'Amico, 408 F.2d at 332.

However, because the clipping by the officer of a few strands of hair was so minor an imposition that the defendant suffered no true humiliation or affront to his dignity, the court held a search warrant was not required to justify the officer's act. D'Amico, 408 F.2d at 333. The taking of several strands of hair while the defendant was in custody was no more prejudicial than taking his fingerprints or his photograph. D'Amico, 408 F.2d at 333. See also United States v. Richardson, 388 F.2d 842, 845 (6th Cir. 1968) (examination of the defendant's hands for evidence of incriminating fluorescein powder held not to be a search within Schmerber).

Similarly, in United States v. Bridges, 499 F.2d 179 (7th Cir. 1974), the court was asked to consider whether a hand swab test conducted on the defendant without his consent during an interrogation violated his fourth amendment rights. Following the defendant's refusal to answer questions concerning his

-10-

handling of explosives during an interrogation, federal agents swabbed his hand without his consent. Based on the chemical analysis of the swabs, the agents obtained a warrant to search defendant's car and house. Bridges, 499 F.2d at 184. The court found the swabbing was not an unreasonable search because it was "no more offensive to [the defendant's] person than fingerprinting or photographing him." Bridges, 499 F.2d at 184.

Defendant relies on People v. Machroli, 44 Ill. 2d 222, 224, 254 N.E.2d 450 (1970), to support his contention that the GSR test constituted an unreasonable search and seizure in light of the facts of this case.

In Machroli, the defendant was arrested by a police officer who responded to a domestic disturbance call. Prior to the defendant's arrest, an officer saw him remove a small white box from his pant's pocket and place it on a dresser. After the defendant left the bedroom, the officer entered, picked up the box, opened it, and discovered three white tablets. The pills were identified as an illegal narcotic. In rejecting the State's justification for the search, the court held "[a] search incident to arrest is authorized when it is reasonably necessary to protect the arresting officer from attack, to prevent escape, or to discover the fruits of the crime." Machroli, 44 Ill. 2d at 224-25, citing Chimel v. California, 395 U.S. 752, 89 S. Ct. 2034, 23 L. Ed. 2d 685 (1969). The court noted the box and its

contents were in no way related to the offense for which the defendant was arrested. The court held there was no justification other than curiosity for the officer's conduct in entering the bedroom and taking possession of the box. Machroli, 44 Ill. 2d at 225.

Similarly, in People v. Burnett, 20 Ill. 2d 624, 170 N.E.2d 546 (1960), our supreme court was asked to consider whether the search of defendant's apartment was incidental to his arrest. After defendant was arrested for operating a "lewd and lascivious" show, the police searched his apartment and found a locked tin box in the bedroom closet. The police opened the box and found obscene photographs. The supreme court held there was nothing in the record to indicate a search of the box was reasonably necessary to protect the officers or prevent the defendant's escape. Burnett, 20 Ill. 2d at 625-26. Additionally, the police had already gathered all of the evidence necessary to prove or connect defendant to the crime he was arrested for. The court held the search of the box was not incidental to the arrest. The evidence was suppressed. Burnett, 20 Ill. 2d at 626.

In Robinson, however, the Supreme Court noted the search incident to a lawful arrest exception to the fourth amendment's warrant requirement has historically been formulated into two distinct positions. Robinson, 414 U.S. at 224. "The first is

-12-

that a search may be made of the <u>person</u> of the arrestee by virtue of the lawful arrest. The second is that a search may be made of the <u>area within control</u> of the arrestee." (Emphasis added.) <u>Robinson</u>, 414 U.S. at 224, 94 S. Ct. at 471, 38 L. Ed. 2d at 435. The Court noted that throughout its series of cases discussing the permissible area beyond the person of an arrestee that may be searched, "no doubt has been expressed as to the <u>unqualified</u> authority of the arresting authority to search the person of the arrestee." (Emphasis added.) <u>Robinson</u>, 414 U.S. at 225, 94 S. Ct. at 472, 38 L. Ed. 2d at 436.

The Supreme Court was asked to consider whether a police officer's inspection of a crumpled cigarette package found on the defendant's person and seizure of heroin capsules found inside the package without a warrant were permissible after the defendant was lawfully arrested for operating a motor vehicle with a revoked license. The Court held a search of a defendant's person incident to a lawful arrest required "no additional justification." <u>Robinson</u>, 414 U.S. at 235, 94 S. Ct. at 477, 38 L. Ed. 2d at 441. "It is the fact of the lawful arrest which establishes the authority to search, and we hold that in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment." <u>Robinson</u>, 414 U.S. at 235, 94 S. Ct. at 477, 38 L.

Ed. 2d at 441.

Our supreme court relied on <u>Robinson</u> in <u>People v. Hoskins</u>, 101 Ill. 2d 209, 216, 461 N.E.2d 941 (1984). In <u>Hoskins</u>, the defendant approached an unmarked police car and offered to perform a sexual act for money. When she was told she was under arrest for prostitution, defendant ran from the officers and dropped her purse. After defendant was caught the police searched her purse. The officers found a hypodermic needle and a metal cap with cocaine adhering to it. The State argued the search was valid as incident to a lawful arrest. The supreme court held the search was proper under <u>Robinson</u>, which "authorizes a warrantless search of the defendant's purse, which is immediately associated with defendant's person, simply on the lawful, custodial arrest." <u>Hoskins</u>, 101 Ill. 2d at 217. The court noted the <u>Robinson</u> holding is " 'a straight forward rule, easily applied, and predictably enforced.' " <u>Hoskins</u>, 101 Ill. 2d at 217, quoting <u>New York v. Belton</u>, 453 U.S. 455, 459, 101 S. Ct. 2860, 2863, 69 L. Ed. 2d 768, 774 (1981) (Supreme Court extended <u>Robinson</u> to all containers within the defendant's immediate control).

Because <u>Machroli</u> and <u>Hoskins</u> involved instances where the police searched the area in the vicinity of the defendant's control, not the defendant's person, we find they are distinguishable from the present case. See <u>Robinson</u>, 414 U.S. at

235, 94 S. Ct. at 477, 38 L. Ed. 2d at 441; Hoskins, 101 Ill. 2d at 217.

The hand swab performed on the defendant was a minor intrusion, no more offensive than fingerprinting or photographing. See Bridges, 499 F.2d at 184. Because the hand swabbing was so "minor an imposition that the defendant suffered no true humiliation or affront to his dignity," we find a search warrant was not required to justify the GSR test after defendant was in custody and while the arresting officers were assigned to investigate the April 17 attempt robbery. See Bridges, 499 F.2d at 184; D'Amico, 408 F.2d at 333. In light of the circumstances in this case, we find the hand swabbing was not an unreasonable search and seizure.

II. Identification Testimony

Defendant contends the trial court's denial of his motion to suppress Goodson's identification was manifestly erroneous. Specifically, defendant contends the photo array used by the police was unduly suggestive. Defendant also contends the admission of Goodson's in-court identification deprived him of his right to due process because the identification was not sufficiently independent from the highly suggestive photo array.

On a motion to suppress identification, the defendant bears the initial burden of establishing the pretrial identification was "so unnecessarily suggestive that it gave rise to a

substantial likelihood of irreparable mistaken identification."
People v. Curtis, 262 Ill. App. 3d 876, 882, 635 N.E.2d 860
(1994).  A trial court's ruling on a motion to suppress
identification will not be set aside unless manifestly erroneous.
Curtis, 262 Ill. App. 3d at 882.

Defendant contends the photograph display was impermissibly
suggestive because Goodson's contradictory testimony indicates
she may have been shown only a single photo of defendant and no
other suspects.  We disagree.

Our supreme court has recognized "show-up" identifications,
or identification procedures that include only a single defendant
without any other suspects, carry "a dangerous degree of improper
suggestion" (People v. Blumenshine, 42 Ill. 2d 508, 512, 250
N.E.2d 152 (1969)), but the trial court here found Detective
O'Shea showed Goodson "a number of photographs" in the hospital.
While we recognize Goodson's testimony at the suppression hearing
and at defendant's trial wavered regarding exactly how many
pictures she was shown in the hospital, she consistently said she
was shown more than one photo in the array.  Detective O'Shea
also testified that he showed Goodson five pictures at the
hospital, which included one picture of the defendant.  Those
photos are part of the record.

The issue of witness credibility was for the court to
resolve.  See People v. Pitman, 211 Ill. 2d 502, 512, 813 N.E.2d

93 (2004) ("This deferential standard of review is grounded in the reality that the circuit court is in a superior position to determine and weigh the credibility of the witnesses, observe the witnesses' demeanor, and resolve conflicts in their testimony.") After reviewing the record, we see no reason to disturb the trial court's finding that Goodson was shown multiple photographs.

Alternatively, defendant contends that even if Goodson was shown a five-photo lineup, the lineup was still unconstitutionally suggestive due to the differences in appearance between defendant and the other alleged individuals in the photo array.

Initially, the State contends defendant waived this issue by failing to raise it in his motion to suppress. See <u>People v. McAdrian</u>, 52 Ill. 2d 250, 253, 287 N.E.2d 688 (1972). Waiver aside, we reject defendant's contention.

Individuals selected for a photo array lineup need not be physically identical. <u>People v. Denton</u>, 329 Ill. App. 3d 246, 250, 767 N.E.2d 879 (2002). "Differences in their appearance go to the weight of the identification, not to its admissibility." <u>Denton</u>, 329 Ill. App. 3d at 250.

Based on a careful review of the photographs presented as part of the record, we find the photo array was not impermissibly suggestive. All individuals displayed in the photo array had similar general physical characteristics. While defendant

contends he was the only person who was actually bald in the photo array, we note all of the individuals had very closely cropped hair in the pictures, which appeared similar to defendant's hairstyle in the picture shown to Goodson.

We find the photo array was not unduly suggestive.  In light of our determination, we need not address defendant's contention that the suggestive photo array tainted Goodson's in court identification.

III. Eyewitness Expert Testimony

Defendant contends the trial court's exclusion of Dr. Steven Penrod's eyewitness identification testimony deprived him of his right to due process and his right to present a defense.

Generally, an expert will be permitted to testify if his experience and qualifications afford him knowledge which is not common to lay persons and where such testimony will aid the trier of fact in reaching its conclusion.  People v. Enis, 139 Ill. 2d 264, 288, 564 N.E.2d 1155 (1990), citing People v. Jordan, 103 Ill. 2d 192, 208, 469 N.E.2d 569 (1984).  See also People v. Sargeant, 292 Ill. App. 3d 508, 685 N.E.2d 956 (1997).  Trial courts are given broad discretion when determining the admissibility of an expert witness.  Enis, 139 Ill. 2d at 290. The question here is whether the trial court abused its discretion.

When considering the reliability of expert testimony, the

court should balance its probative value against its unfairly prejudicial effect. Enis, 139 Ill. 2d at 290. "In the exercise of his discretion, the trial judge should also carefully consider the necessity and relevance of the expert testimony in light of the facts in the case before him prior to admitting it for the jury's consideration." Enis, 139 Ill. 2d at 290.

In Enis, our supreme court considered whether the defendant was entitled to introduce testimony of an expert witness regarding reliability of eyewitness testimony. The defense, in an offer of proof, claimed the expert would testify that: the relationship between confidence and accuracy is insignificant; the higher the stress level the less accurate the memory; the identification is usually worse if a weapon is present; and jurors give too much weight to time estimates.

The supreme court found the expert's testimony was not necessary because none of the witnesses was in a high stress situation, only one witness saw a weapon, and testimony regarding time estimates was not relevant to the case. Further, the court found that while the witnesses' confidence may have been at issue in the case, that factor alone did not warrant a new trial. Concluding the expert testimony would not have aided the jury in reaching its conclusion, the court held the trial court did not abuse its discretion in denying the testimony. Enis, 139 Ill. 2d at 289.

Other Illinois cases have uniformly upheld a trial court's refusal to allow expert eyewitness testimony. See People v. Tisdel, 338 Ill. App. 3d 465, 788 N.E.2d 1149 (2003) (Tisdel II); People v. Tisdel, 316 Ill. App. 3d 1143, 1159, 739 N.E.2d 31 (2000), *rev'd on other grounds* 201 Ill. 2d 597, 775 N.E.2d 921 (2002) (Tisdel I); People v. Perruquet, 118 Ill. App. 3d 339, 454 N.E.2d 1051 (1983) (trial court properly excluded expert testimony regarding effect of stress upon a victim's recall of events where a weapon is used); People v. Brown, 100 Ill. App. 3d 57, 426 N.E.2d 575 (1981) (factors such as stress, opportunity to observe, distortion of memory, and problems of cross-racial identification are within realm of common experience and can be evaluated by jury without expert assistance); People v. Johnson, 97 Ill. App. 3d 1055, 423 N.E.2d 1206 (1981); People v. Dixon, 87 Ill. App. 3d 814, 410 N.E.2d 252 (1980) (trial court properly excluded expert testimony concerning unreliability of cross-racial identifications, reasoning trustworthiness of eyewitness observation is not generally beyond the common knowledge and experience of average juror). The Seventh Circuit also disfavors expert testimony on the reliability of eyewitness identification on the grounds that it does not assist the jury. See, *e.g.*, United States v. Hall, 165 F.3d 1095 (7th Cir. 1999).

In Tisdel II, we noted that numerous studies in the area of eyewitness psychology indicate there is significant potential for

eyewitness error, and that jurors have misconceptions about the abilities of eyewitnesses. Tisdel, 338 Ill. App. 3d at 467. We held that a trial court should:

> "carefully scrutinize the proffered testimony to determine its relevance-that is, whether there is a logical connection between the testimony and the facts of the case. Normally, expert testimony that is probative and relevant should be allowed." Tisdel, 338 Ill. App. 3d at 468, citing People v. Sargeant, 292 Ill. App. 3d 508, 685 N.E.2d 956 (1997).

The defendant in Tisdel II contended the expert's testimony should have been admitted because it would have aided the jury in reaching a more informed decision as to the credibility of the eyewitness testimony. Because the record showed the trial judge considered the reliability and potential helpfulness of the testimony, balanced the proffered testimony against cases in which courts have upheld the exclusion of such evidence, and found the testimony would not assist the jury, we found the trial court properly exercised its discretion under Enis. Tisdel, 338 Ill. App. 3d at 468. However, we noted the trial court would not have abused its discretion had it allowed the testimony, given the facts of the case. Tisdel, 338 Ill. App. 3d at 468.

-21-

Several other jurisdictions have found the exclusion of expert testimony regarding eyewitness identification is an abuse of discretion in certain cases. See People v. LeGrand, 8 N.Y.3d 449, 867 N.E.2d 374 (2007); United States v. Brownlee, 454 F.3d 131 (3rd Cir. 2006); United States v. Smithers, 212 F.3d 306 (6th Cir. 2000); United States v. Lester, 254 F. Supp. 2d 602 (E.D. Va. 2003); United States v. Norwood, 939 F. Supp. 1132 (D. N.J. 1996); State v. Chapple, 135 Ariz. 281, 660 P.2d 1208 (1983); People v. Campbell, 847 P.2d 228 (Colo. App. 1992).

In LeGrand, the defendant moved to introduce eyewitness expert testimony. According to a supporting memorandum of law, the expert would have testified to research findings regarding several factors that may influence the perception and memory of a witness and affect the reliability of eyewitness identifications. The expert would not, however, opine on the accuracy of any specific eyewitness identification. After conducting a Frye hearing, the trial court precluded the testimony on the ground that the expert's conclusions were not generally accepted in the relevant scientific community.

The New York court of appeals held where there was no corroborating evidence connecting the defendant to the commission of the crime, and it was clear the case turned solely on the accuracy of the single witness' identification, it was an abuse of discretion for the trial court to prohibit the expert's

testimony.  LeGrand, 8 N.Y.3d at 457.  The court held the testimony of the defendant's expert would have benefitted the jury in evaluating the accuracy of the eyewitness identification. A new trial was ordered.

In Brownlee, the court held the primary issue before the jury was the reliability of the Government's four eyewitnesses. The court noted:

> "Both [eyewitnesses] expressed high confidence in their identifications of [the defendant] as the perpetrator.  To rebut the natural assumption that such a strong expression of confidence indicates an unusually reliable identification, [the defendant] sought to admit [expert] testimony that there is a low correlation between confidence and accuracy.  We believe that [the expert's] proposed testimony 'is sufficiently tied to the facts of this case that it will aid the jury in resolving a factual dispute.' "  Brownlee, 454 F.3d at 144, quoting United States v. Downing, 753 F.2d 1224, 1242 (3rd Cir. 1985).

The conviction was reversed and the case sent back for a new trial.

1-06-1943

In the case before us, the defense submitted an offer of proof in the form of a report prepared by Dr. Steven Penrod, an experienced and highly-credentialed psychologist. We have examined the report in the context of the factual posture of the case--little or no corroboration of the testimony of a single identification witness who was not asked to identify the defendant in person until she saw him at counsel table, in jail uniform, at a hearing conducted 44 months after the attempt robbery.

Some of the data and conclusions referred to in the report do not fit the facts of the case. For example, data supporting the unreliability of cross-racial identifications would not fit because there is no indication Dr. Penrod considered the Korean eyewitness had been married to an African-American. Nor do we see the need in this case for expert testimony concerning the conduct of the photo array.

Other portions of the report are relevant and refer to commonly accepted misconceptions. For instance, studies have shown a witness's focus on a weapon indicates less attention is paid to encoding the perpetrator's characteristics. Other studies show jurors tend to rely on a witness's confidence in her identification as a guide to accuracy, but that there are low correlations between the witness's confidence and the accuracy of her identification.

In final argument, the prosecutor presented conclusions that would have been challenged by Dr. Penrod's data concerning weapon focus, stress, and the relationship between witness confidence and witness accuracy. The State's comments: "[t]here is no higher degree of attention than someone pointing a gun at you;" "[defendant's] face is burned in her memory forever;" "[t]here is no doubt she was certain;" and "if she is so certain, there is no reason and no doubt that you should be certain."

Neither at trial nor in this appeal does the State challenge the reliability of the research cited by Dr. Penrod. Nor did the trial court when it rejected the proposed testimony. The court merely said it did not believe:

> "experts in this particular case will assist
> the jury in determining the identification in
> this case. I believe it would probably
> confuse them more and I believe that the
> instruction that's provided by the Illinois
> Pattern Jury Instructions is sufficient."

Almost always, when a reviewing court upholds the trial court's discretion to reject the eyewitness identification expert's testimony it does so on the grounds that the testimony will not assist the jury. That is, jurors can use their own common sense and experience in life. See Enis, 139 Ill. 2d at 288. Reliability of the studies rarely is questioned. See U.S.

-25-

v. Moore, 786 F.2d 1308, 1312 (5th Cir. 1986) ("This court accepts the modern conclusion that the admission of expert testimony regarding eyewitness identification is proper, and we have no prior contrary authority which binds us.  We cannot say such scientific data is inadequate or contradictory.")  In Brownlee, the court referred to the research that demonstrates "the science of eyewitness perception has achieved the level of exactness, methodology and reliability of any psychological research."  Brownlee, 454 F.3d at 143.

The research challenges the claim that the jury does not require expert assistance.  As the prosecutor understood, reasonable people well might believe an eyewitness will be more accurate when faced with a weapon and when the witness shows confidence in the accuracy of her identification.  The expert testimony "dispels myths or attacks commonsense misconceptions about eyewitness identifications, such as the effects of stress and weapon focus on the accuracy of identifications."  Tisdel, 338 Ill. App. 3d at 467.  In Tisdel I we said:

> "Numerous studies in the area of eyewitness psychology indicate there is a significant potential for eyewitness error and that jurors have misconceptions about the abilities of eyewitnesses."  Tisdel, 316 Ill. App. 3d at 1157.

1-06-1943

Here, unlike the witnesses in Enis, Goodson was in a high stress situation, faced with a gun and an obvious threat to her life. She was the only eyewitness. Her apparent confidence on the witness stand was reflected in the prosecutor's rebuttal argument.

In Tisdel I the trial court considered the reliability and "potential helpfulness of the testimony," and "balanced the proffered testimony against cases in which this court has upheld the exclusion of such evidence ***." Tisdel, 316 Ill. App. 3d at 1158.

It is not our purpose to lower the bar for the exercise of broad discretion trial judges have when it comes to expert testimony on eyewitness identification. But present here is the failure to address the obligation we set out in Tisdel II:

> "Trial courts should carefully scrutinize the proffered testimony to determine its relevance--that is, whether there is a logical connection between the testimony and the facts of the case." Tisdel, 338 Ill. App. 3d at 468.

No careful scrutiny took place in this case. Relevance of the different parts of Dr. Penrod's proposed testimony was not seriously considered. Nor their weight. The conclusion that the proposed testimony would confuse the jury had no considered

-27-

basis.  The balancing test requires a weighing of "probative value against its prejudicial effect."  Enis, 139 Ill. 2d at 290.  The test cannot be accomplished without an inquiry into the probative value of the proposed testimony and its relevance to the issues in the case.  It is then that the inquiry shifts to the risk of unfair prejudice, which includes potential confusion.

Because of the trial court's failure to conduct a meaningful inquiry into Dr. Penrod's proposed testimony, under the specific circumstances of this case, we reverse the defendant's convictions and remand this cause for a new trial.  We remand because we find the evidence sufficient to support a guilty verdict.

We express no opinion on whether the trial court on remand should allow any part of Dr. Penrod's offer of proof to be heard by the jury.  We simply hold the offer of proof must be given serious consideration.  If any of it is admitted, the witness should not be allowed to directly comment on Goodson's credibility or on the weight that should be given to her testimony.  The expert might supply relevant data, but it is for the jury to decide what weight, if any, to give the research offered by the expert.  See People v. Sargeant, 292 Ill. App. 3d 508, 511, 685 N.E.2d 956 (1997) (the expert must not invade the province of the factfinder, while aiding the factfinder in reaching its decision).

-28-

1-06-1943

IV. Other Claimed Errors

Defendant contends the trial court erred when it denied his motion to exclude the results of the GSR test, refused to permit counsel to publish the tape of Smith's interview with Goodson, and admitted Goodson's bloody clothing into evidence.  In addition, the defendant contends his trial counsel was ineffective for failing to argue the photo array used in this case was highly suggestive.  We have examined these issues and find they have no merit.  Defendant also raises issues concerning his sentencing.  We see no need to discuss them.

CONCLUSION

For the reasons stated, we reverse defendant's convictions and sentences and remand this cause for a new trial.

Reversed and remanded.

GARCIA, and R. GORDON, JJ., concur.