2016 IL App (1st) 133648

No. 1-13-3648

Opinion filed March 8, 2016

Second Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) ) | No. 10 CR 11194 |
| BRIAN THOMPSON, | ) ) ) | The Honorable Stanley J. Sacks, |
| Defendant-Appellant. | ) ) ) | Judge, presiding. |

JUSTICE HYMAN delivered the judgment of the court, with opinion.
Justices Neville and Simon concurred in the judgment and opinion.

**OPINION**

¶ 1    In 2010, Joshua Evans and Daniel Crockett, Jr., were shot in front of their home in Chicago by two men who drove up in a black Audi. Joshua Evans survived, but Daniel Crockett, Jr., did not. Crockett's brother Ryheam Crockett eventually informed police (through his father, Daniel Crockett, Sr.) that he recognized the two shooters as "Brian" (defendant Thompson) and "Ant" (codefendant Anthony Nance), whom he knew from the neighborhood. Evans, Ryheam, and Ryheam's mother Colleen Crockett eventually identified both Thompson and Nance as the shooters. The two men were tried simultaneously by separate juries; both were convicted of first

degree murder and attempted first degree murder. Thompson was sentenced to a total of 60 years of imprisonment.

¶ 2 Thompson alleges the State's eyewitnesses (Joshua Evans, Ryheam, and Colleen Crockett) were unreliable and, hence the evidence against him insufficient to convict. We disagree, as the potential problems with the identifications were presented to the jury. Thompson also alleges that the trial court erred in admitting Ryheam's prior consistent statement to his father identifying Thompson and Nance as the shooters. We hold that the statement was admissible when testified to by Ryheam as a statement of identification. But, a police officer's testimony regarding the statement should not have been admitted, but any error was harmless.

¶ 3 Thompson also alleges that the trial court committed plain error in allowing the State to make improper opening statements and closing arguments. While some of the State's remarks rely on questionable advocacy, we do find that they rise to the level of clear and obvious error.

¶ 4 Finally, Thompson maintains, and the State agrees, that he is entitled to an additional 10 days of credit towards his sentence based on his time in pretrial custody. We agree as well.

¶ 5 BACKGROUND

¶ 6 Opening Statement

¶ 7 The State began its opening statement by focusing on Colleen's experience of the crime: how she would "never forget the sound of those bullets" and "the voice of her 15 year old nephew. Auntie, I've been hit." The State asked, "What could be worse than witnessing your 15 year old nephew being shot, racing him to the hospital praying all the way that he doesn't die?" The State then answered that question with, "her own son had been shot by that spray of bullets. Her nephew would be lucky enough to live to tell about that bloody day. Her son wouldn't be so lucky."

¶ 8     The State described the defendants' actions and the charges against them, and returned to focusing on Colleen, describing her activities on the day of the murder. "And the next moments would change Colleen's life forever and the next moments would end her son's." The State then described what Colleen witnessed, and ended with a description of her son's death at the hospital: "[W]hile she was there with her nephew, the emergency personnel brought in her son. The doctors began to work on him and in a little while Colleen would be taken to that little room to hear the words every parent dreads; your son didn't make it." The State described the physical evidence and the police investigation, including the eyewitness identifications of the codefendants.

¶ 9                              Trial Testimony

¶ 10    Colleen Crockett testified that on March 26, 2010, she was living at 1927 South St. Louis in Chicago with her husband, Daniel Crockett, Sr., her sons, Daniel Crockett, Jr. and Ryheam Crockett, and her nephew Joshua Evans. She had parked on the street next to the house and was talking to Joshua and Ryheam, who were outside her car. A number of other people from the neighborhood mingled outside, including several friends of Joshua and Ryheam. A black Audi automobile pulled up next to Colleen's car and two men emerged. She saw the men's faces and heard gunshots. Colleen did not know these men and had never seen them before. She heard her nephew Joshua yell that he'd been shot, and Colleen saw one of the men shooting. The two men got back into the Audi and drove off. Colleen and her husband put Joshua into her car and drove toward the hospital. On the way, she passed an ambulance heading towards her home and stopped; the ambulance personnel told her that another victim had been shot, so Daniel Sr. returned to the house while Colleen went to the hospital with Joshua. Her son Daniel Jr. was brought to the same hospital.

¶ 11	On April 9, 2010, Colleen viewed a photo array and identified one photo. On April 12, she viewed a physical lineup and identified Brian Thompson as the driver of the Audi and one of the shooters; she identified Anthony Nance as the other shooter, who emerged from the passenger seat of the Audi, at another lineup on May 20. After the shooting, Colleen and her family received money from the state to move out of the neighborhood.

¶ 12	On cross-examination, Colleen admitted that the entire incident happened quickly and unexpectedly, and did not remember whether the Audi's windows were tinted or whether its tires screeched when it pulled up. Colleen had described the shooters to police as black males between 20 and 30 years old, but could not describe their heights, facial hair, or clothing.

¶ 13	Joshua Evans testified that in 2010 he was 16 years old. On the day of the shooting, he was talking to his aunt Colleen as she sat in her car; nearby on the sidewalk was his cousin Ryheam. Suddenly, Evans heard tires screech from an alley three houses away, and saw a black Audi pull up in front of Colleen's car. There were three people in the car; Thompson emerged from the driver's side and Nance from the passenger's side. Evans recognized them from around the neighborhood, and knew Nance's brother, but did not know their full names. Nance aimed a gun at Evans and started shooting, while Thompson began shooting the opposite way, but Evans did not see who Thompson was shooting at. Evans heard gunshots that sounded like they had come from two different weapons. Evans saw his cousin Daniel Jr. running away, and Evans ran, too, towards his house, until he realized he had been shot and called for help.

¶ 14	Evans took a bullet to the leg and spent a few days in the hospital. He testified that he was "kind of" afraid of the shooters. On April 12, he viewed a lineup and identified Thompson as the man who emerged from the driver's side of the Audi and fired a weapon. On April 28, he

identified a photograph of Nance. On May 20, he viewed another lineup and identified Nance as the person who had fired a weapon towards him.

¶ 15      On cross-examination, Evans testified that he had never seen the Audi before the shooting and there was nothing unusual about it. The shooting happened quickly. Nance wore a red jacket during the shooting, but Evans did not remember telling police that detail. While at the hospital, Evans asked police officers whether his cousin Daniel was all right, and the officer responded that he did not care. This comment offended Evans and Evans refused to talk to police while he was in the hospital. After the shooting, he continued to live with the Crocketts, but did not discuss the shooting with Colleen or Ryheam.

¶ 16       Ryheam Crockett testified that on March 26, 2010, he was talking to Colleen as she sat in her car outside their home. When the black Audi pulled out of the alley and parked by Colleen's car, Ryheam recognized Nance in the Audi's passenger seat, and Thompson in the driver's seat. In 2010, Ryheam had known Nance and Thompson for several years as "Ant" and "Brian," respectively, and did not get along with them. Nance started firing a gun towards the alley, while Thompson shot towards the front of the house. The shots sounded like they came from two different guns. Ryheam ran away when the shooting started, then circled back to the house in time to see Colleen and Daniel Sr. putting Joshua Evans into the car. Ryheam then saw Daniel Jr. lying on the ground by the alley.

¶ 17      Ryheam testified that on the day of the event he did not tell police that he knew the shooters. He was then asked about a telephone conversation he had with his father, Daniel Sr., on March 28 or 29. When Ryheam began to describe the conversation, defense counsel objected on the ground that the conversation was hearsay. The trial court overruled the objection. Ryheam testified that Daniel Sr. had wanted him to cooperate with the police and identify the

shooters, so Ryheam told Daniel Sr. that "Ant" and "Brian" were the shooters and the name of their neighborhood.

¶ 18     On April 9, Ryheam identified Nance and Thompson in a photo array as the shooters; he did not tell police this information earlier because he was nervous and scared of the defendants, since Ryheam and his family were still living in the same house. The Crocketts moved out of that house on April 12, the same day Ryheam identified Thompson in a lineup. He identified Nance in a lineup on May 20.

¶ 19     On cross-examination, Ryheam was impeached with his multiple convictions for narcotics possession and sales. He admitted the shooting happened quickly and was unable to state the color of the shooters' guns. After the shooting, he had discussed it with his family and told them what he saw.

¶ 20     Police detective Roberto Garcia testified that on March 29, he met with Daniel Crockett, Sr., and asked him to contact Ryheam on the telephone, to encourage Ryheam to cooperate with the investigation. Defense counsel objected to the testimony about the conversation between Daniel Sr. and Ryheam. The trial court overruled the objection. Detective Garcia testified that based on the information Daniel Sr. gave him, he made a photo array containing Thompson and Nance; he was only given the names "Brian" and "Ant," and their neighborhood.

¶ 21     Abshalom Timms testified that at 7 p.m. on March 26, he was in a nearby park when he saw three cars, including a black Audi, drive the wrong way down an alley and park. Two men poured gasoline inside the Audi and then lit the car on fire. Timms spoke to police a few days later, but he could not identify anyone involved. The police found a burnt temporary license plate on the Audi, but the plate actually belonged to a different vehicle and seemed to have been stolen.

¶ 22    Lamar Booth, who lived across the street from the Crocketts, described hearing the gunfire and seeing a black Audi parked near the Crockett house and two men standing near the Audi, facing the Crockett house.  Booth did not see their faces.  Booth testified that he had been in the United States Marine Corps between 1984 and 1989, and had been stationed at Camp Pendleton, Camp LeJeune, and on Okinawa.

¶ 23    Police technicians found two different types of cartridge casings in the street outside the house.  Analysis showed  the shooting involved at least two guns.

¶ 24                                          Closing Argument

¶ 25    The prosecution began closing arguments by describing the crime as Colleen Crockett's "worst nightmare." The prosecutor reviewed the eyewitness testimony and the police investigation, and then discussed the applicable law.  Thompson's counsel argued that the eyewitness identifications were not reliable and characterized the other evidence pointing to his involvement as circumstantial.  He also stated that Ryheam Crockett had a number of felony convictions for narcotics.

¶ 26    In rebuttal, the State mentioned Colleen: "Is there any heart in this courtroom that wasn't breaking for that woman as she was on the stand?  Lost her son.  Saw her nephew being shot.  Is there anyone's heart that does not break for that woman?  Other than his maybe.  She has been through hell."  The State also tried to rehabilitate Ryheam: "But remember that lady justice statue?  Do you think she peeks out from behind that blindfold and says justice for all, or wait, no, not actually for you Ryheam because you have four felony convictions so there will never be justice for you."  The State discussed Lamar Booth's testimony, describing him as "the Marine who went to Japan and Iraq," and stating that Thompson did not have "the right to go [to] a quiet block and light it up with bullets so people like Lamar Booth, who go to Iraq and Japan, have to

hear gunfire on their own street." Finally, the State twice described Thompson as "a cold-blooded killer," adding that "you may get a chill up your spine when you look at him."

¶ 27     The jury began to deliberate at 3 p.m.; at 5:38 p.m., Thompson's jury sent out a note saying that they were deadlocked. The judge instructed them to continue deliberating, and at 9:18 p.m. the jury reached a guilty verdict. The jury found Thompson guilty of first degree murder and attempted first degree murder, and the trial court sentenced Thompson to a total of 60 years of imprisonment, with a total of 1,294 days of credit for presentence custody.

¶ 28     In his posttrial motion, Thompson argued that the evidence was insufficient to find him guilty, that the trial court erred in allowing hearsay prior consistent statements that Ryheam had identified "Ant" and "Brian" as the shooters, and challenged the prosecutor's closing argument (though on different grounds than the ones argued in this appeal).

¶ 29                                   ANALYSIS

¶ 30                          Sufficiency of the Evidence

¶ 31     Thompson's challenge to the sufficiency of the evidence centers on the alleged unreliability of the State's eyewitnesses: Colleen Crockett, Ryheam Crockett, and Joshua Evans. Thompson argues that their identifications, which occurred weeks after the shooting, were unreliable because the witnesses did not have a good opportunity to view the shooters, they did not give detailed descriptions of the shooters to police before identifying Thompson, and the three witnesses, as members of the same family, had a motive to lie.

¶ 32     The relevant inquiry when challenging the sufficiency of the evidence involves, after viewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Campbell*, 146 Ill. 2d 363, 374 (1992). As a reviewing court, we will not substitute our judgment

for that of the trier of fact on questions concerning the weight of the evidence or the credibility of the witnesses. *Id*. at 375. And, we will not reverse a criminal conviction unless the evidence is so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of the defendant's guilt. *Id*.

¶ 33     A person commits first degree murder if, in performing the acts that cause a death, he or she either intends to kill or do great bodily harm to the victim or another individual, knows that the acts will cause the victim's or another's death, or knows the acts create a strong probability of death or great bodily harm to the victim or another.  720 ILCS 5/9-1(a)(1), (a)(2) (West 2008). A person commits attempted murder when, with intent to commit murder, he or she takes any substantial step towards committing murder.  720 ILCS 5/8-4(a), 9-1 (West 2008).

¶ 34     We afford great deference to the jury's determination of witness credibility.  *People v. Donahue,* 2014 IL App (1st) 120163, ¶ 82.  In evaluating eyewitness identifications, we examine (1) the witness's opportunity to view the offender during the crime; (2) the witness's degree of attention; (3) the accuracy of any earlier description of the offender given by the witness; (4) the witness's level of certainty at the identification confrontation; and (5) the length of time between the crime and the identification.  *People v. Starks*, 2014 IL App (1st) 121169, ¶ 48.  The testimony of a single eyewitness may suffice to convict if the witness is credible and was able to view the defendant under conditions permitting a positive identification.  *People v. Petermon*, 2014 IL App (1st) 113536, ¶ 30.

¶ 35     Though "[e]yewitness testimony under the best of conditions is subject to all of the frailties of human perception" (*People v. Hernandez*, 312 Ill. App. 3d 1032, 1037 (2000)), the consistency of the identifications, and the familiarity of two eyewitnesses with Thompson personally, support the conclusion that the evidence was sufficient.  Colleen Crockett identified

Thompson in a lineup about two weeks after the shooting. Joshua Evans recognized Thompson during the shooting and identified him at the same lineup. Ryheam Crockett also recognized Thompson (who he had known several years), told Daniel Sr. about Thompson's involvement a few days after the shooting, identified Thompson in a photo array on April 9, and identified Thompson in a lineup on April 12. See, *e.g., Petermon*, 2014 IL App (1st) 113536, ¶ 32 (identification sufficient where witness recognized codefendants); *People v. Sullivan*, 366 Ill. App. 3d 770, 783 (2006) (identification sufficient where witness had seen defendant "'plenty of times'" and identified him by nickname on night of crime); *People v. Barnes*, 364 Ill. App. 3d 888, 895 (2006) (identification bolstered because witness encountered defendant on multiple occasions before crime).

¶ 36　　We do not find Thompson's challenge persuasive. Ryheam Crockett first named Thompson as one of the perpetrators a few days after the shooting. The other identifications (via photo array or physical lineup) took place within a few weeks after the shooting. *Starks*, 2014 IL App (1st) 121169, ¶ 50 (initial identification made just over two weeks after crime supports reliability); *Petermon*, 2014 IL App (1st) 113536, ¶ 35 (two weeks); *People v. Donahue*, 2014 IL App (1st) 120163, ¶ 95 (witnesses identified defendant 3 and 11 days after crime). The crime took place in the late afternoon outside, and other than the small amount of time, there is no indication that the witness's views of the shooters were obstructed.

¶ 37　　Colleen provided a vague and undetailed physical description of the shooters; the other two eyewitnesses knew the shooters' names. When an eyewitness is asked to select a suspect from a lineup and that suspect was previously unknown to them, then we look to whether the physical description the eyewitness gave police before the lineup squares with the actual

suspect's physical features. This concern is not present because Thompson was put into the lineup based on Ryheam's identification of him by name.

¶ 38    Finally, there is no evidence that the three eyewitnesses, being related to each other, conspired to point the finger at an innocent person, or what reasons they might have for doing so. Certainly, if they identified the wrong person, then the actual perpetrator would remain at large. Thompson suggests that Ryheam had a motive to identify him because the two did not get along, but the same information supports Thompson's guilt by supplying motive for Thompson to shoot at Ryheam and his family. The evidence was sufficient to support Thompson's convictions.

¶ 39    Admission of Ryheam Crockett's Prior Consistent Statement

¶ 40    Thompson challenges admission of testimony regarding Ryheam Crockett's prior consistent statement to his father (which was then relayed to Detective Garcia) identifying Thompson and Nance as the shooters. The state claims that Thompson did not sufficiently raise this issue in his posttrial motion. But that motion does challenge admission of the hearsay statement, so we will consider the issue. A trial court's evidentiary rulings will not be disturbed absent an abuse of discretion. *People v. Short*, 2014 IL App (1st) 121262, ¶ 102.

¶ 41    Ryheam's testimony that he told his father that Thompson and Nance were the shooters was not hearsay; it was admissible as a prior identification. See 725 ILCS 5/115-12 (West 2008) (statement not rendered inadmissible if declarant testifies and is subject to cross-examination, and statement is one identifying person "made after perceiving him"); Ill. R. Evid. 801(d)(1)(B) (eff. Jan. 1, 2011) (codifying section 115-12). Thompson suggests that the statute does not apply because Ryheam did not identify Thompson until a few days after the shooting. But the statute does not require immediate identification, and we will not read into the statute any provision that the plain language of that statute does not contain. *People v. Lewis*, 223 Ill. 2d 393, 402 (2006).

Similarly, the statute does not specify that Ryheam's statement must have been made after "perceiving" Thompson in any formal identification procedure, such as a lineup. Rather, we have interpreted this rule to include any "identification evidence," including a witness's statements to police describing the offender. *People v. Newbill*, 374 Ill. App. 3d 847, 851-53 (2007).

¶ 42     We draw a different conclusion as to Detective Garcia's testimony that Daniel Crockett, Sr., told him that Ryheam had told Daniel Sr. about Thompson and Nance. If Ryheam had told this information to Detective Garcia directly, it would be admissible as a statement of identification. *Id.* at 853. But, the reliability of the information is attenuated because Daniel Sr. was the intermediary between Ryheam and Detective Garcia; Daniel Sr. never testified. There must be some limit on the number of people in the chain of communication who can testify to the original statement of identification, or trial becomes a game of "Telephone." Ryheam's statement to Daniel Sr. was admissible nonhearsay under section 115-12, but Daniel Sr.'s statement to Detective Garcia is not admissible under that provision.

¶ 43     The State suggests that Daniel Sr.'s statement to Detective Garcia is admissible to show the course of Detective Garcia's investigation. See *People v. Banks*, 237 Ill. 2d 154, 181 (2010) (hearsay statement admissible to explain investigatory procedure following statement). But Detective Garcia testified not only to what he did as a result of his conversation with Daniel Sr. (compiling a photo array), but also to the substantive information Daniel Sr. gave him (names and location of Thompson and Nance). This is not admissible. See *People v. Gacho*, 122 Ill. 2d 221, 248 (1988) (testimony regarding course of investigation admissible, but substance of conversation identifying defendant is inadmissible).

¶ 44       We hold, however, that the error in admitting Detective Garcia's testimony as to the substance of the information was harmless. As explained, Ryheam's prior statement of identification was properly admitted nonhearsay during Ryheam's testimony, so the substance of the information was already before the jury without Detective Garcia's repetition.

¶ 45                  The State's Opening and Closing Argument

¶ 46       Thompson next argues that the prosecutor made several improper statements during the opening and closing arguments. Defense counsel did not object to these statements, nor include the argument in a posttrial motion. The State argues, and Thompson acknowledges, that the issue is reviewable only for plain error. To meet the plain error standard, defendant has the burden to show that a clear or obvious error occurred, and either (1) the evidence is so closely balanced that the error, standing alone, threatened to tip the scales against defendant regardless of the seriousness of the error, or (2) the error was so serious that it affected the trial's fairness and challenged the integrity of the judicial process. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010).

¶ 47       A prosecutor's opening statement or closing argument must be viewed in its entirety, and any challenged remarks viewed in context. *People v. Nicholas*, 218 Ill. 2d 104, 122 (2005). Prosecutors have wide latitude in framing their closing arguments, and may comment on the evidence and any fair, reasonable inferences from the evidence. *People v. Willis*, 2013 IL App (1st) 110233, ¶ 101. Though some of the prosecutor's statements in the opening and in closing argument were questionable, viewing the opening statement and closing argument as a whole, the statements do not rise to the level of plain error under either prong.

¶ 48       Closing argument must serve a purpose beyond inflaming the jury's emotions. *People v. Wheeler*, 226 Ill. 2d 92, 128 (2007). Thompson alleges that the prosecution's repeated references to Colleen's emotions and loss of her son violated this rule; but though the prosecutor certainly

returned to this theme again and again, it does not rise to the level of a clear or obvious error. See *People v. Emerson*, 189 Ill. 2d 436, 513-14 (2000) (closing argument containing emotional appeal to victim's hopes and dreams was improper, but did not impact verdict). This is not a case like *People v. Blue*, where the prosecution combined reminders to the jury of the pain endured by the victim's family with a wealth of extraneous, nonprobative evidence that served "only one purpose, namely, to highlight the poignancy of the [victim's] family's loss and to suggest to the jury that the family's pain could be alleviated by a guilty verdict." 189 Ill. 2d 99, 129-32 (2000).

¶ 49      The prosecutor referred to Thompson as "cold-blooded," and suggested that he might cause a chill to run up the jurors' spines. Though a prosecutor may not characterize a defendant as "evil," he or she may characterize the defendant's actions as a permissible comment on the evidence. *Nicholas*, 218 Ill. 2d at 121-22. Given that Thompson was convicted of firing a gun into a crowd of unsuspecting people, we find that the "cold-blooded" comment did not rise to the level of clear or obvious error.

¶ 50      Next, the prosecutor referred to a prosecution witness, Lamar Booth, as a veteran of the Iraq War who had to hear gunfire on his own street. Though Booth testified that he served in the Marine Corps for several years, he did not testify that he ever went to Iraq, or indeed served in any conflict. The prosecution misstated the evidence when it implied that the jury should credit Booth's testimony because of risks he faced in the military. *People v. Gray*, 406 Ill. App. 3d 466, 475-76 (2010). But, viewed in the context of the entire remarks, we do not believe that the prosecution's passing mentions of Booth (who was not an important witness) rise to the level of clear or obvious error. Thompson also argues that these comments correspond to the prosecution calling the streets a "war zone" or "Chiraq," but the prosecution never actually used those terms,

and in any event, the case turned on witness credibility, not an assessment of the dangerousness of the neighborhood. *Donahue*, 2014 IL App (1st) 120163, ¶¶ 116-17.

¶ 51     Finally, the prosecution discussed Ryheam's past convictions, suggesting that Ryheam was entitled to justice despite his criminal history, in response to Thompson's counsel's argument that Ryheam was not credible. A prosecutor may attempt to repair the credibility of a prime witness after the witness has been attacked by the defendant. *People v. Figueroa*, 381 Ill. App. 3d 828, 850-51 (2008). The prosecution's comments did not rise to the level of clear or obvious error.

¶ 52     Nevertheless, we do disapprove of the prosecution's harping on Colleen's emotional state as a mother who had lost her child and its attempt to link Lamar Booth to the Iraq War. But the prosecution's opening and closing comprised nearly 40 pages of transcript, and, we consider the whole opening and whole closing rather than each statement in isolation. *Nicholas*, 218 Ill. 2d at 122. As such, we do not conclude that these statements so tainted the entire argument as to rise to the level of plain error.

¶ 53                         Credit Against Thompson's Sentence

¶ 54     Finally, the parties agree to giving Thompson an additional 10 days of credit for time spent in presentence custody, for a total of 1,304 days (instead of 1,294 days). This court has the authority to order the clerk to correct the mittimus without remand. See, *e.g., People v. Burton*, 2015 IL App (1st) 131600, ¶ 40. We direct the clerk of the circuit court to correct the mittimus to reflect that Thompson served 1,304 days of presentence custody.

¶ 55     Affirmed.